THE STATE ex rel. AMERICAN LEAD & BARYTA COMPANY and MISSOURI TRUST COMPANY v. DEARING, Judge, DONNELL, Receiver, and ELLEDGE.

In Banc, December 13, 1904.

1. **PROHIBITION: Vacation: One Judge.** By its inherent powers, by the power conferred on it by the Constitution and by the power conferred on it by the statute, the Supreme Court or a judge thereof has power, in vacation, to issue a preliminary rule in prohibition, returnable to and triable by the court in term time.

2. ————: **Receiver: Appointment in Vacation: Excess of Power.** It is in excess of the power of a circuit judge to appoint a receiver for a corporation in vacation without notice to the defendants (its officers, directors and creditors) and to issue a rule returnable before him in vacation to show cause why the appointment should not be made permanent.

3. **RECEIVER: Appointment: Solvent Corporation.** So long as a corporation is solvent and a going concern, no court has the right to place it in the hands of a receiver—especially. when the person making the application is neither a creditor nor a stockholder, but has no interest in it except a percentage in the profits of its business.

4. ————: ————: **Removal of Books of Foreign Corporation: Remedy.** If the officers of a foreign corporation organized for the purpose of doing business in this State are about to unlawfully remove the books of the company from the State, an

State ex rel. v. Dearing.

injunction will lie to prevent their doing so, if the person bringing the suit has any legal connection with the company such as would authorize him to ask the aid of a court of equity, but he cannot on that ground have a receiver appointed for a solvent company.

5. PROHIBITION: Receiver: Appointment: Application to Vacate. Where on the face of the record it appears that the court exceeded its jurisdiction in appointing a receiver of a corporation, it is not necessary that an application be made to the judge to vacate the appointment before this court will issue its writ of prohibition prohibiting the judge from enforcing the order appointing the receiver.

Prohibition.

RULE MADE ABSOLUTE.

*James P. Dawson* and *E. T. Eversole* for relators.

*H. J. Cantwell* and *Sam Byrnes* for respondents.

(1)  There is no power conferred on the judges of the Supreme Court acting singly or out of term to issue the powerful prerogative writ of prohibition.  Section 3 of article 6 of the Missouri Constitution confers the power on the Supreme Court to issue writs of *habeas corpus, mandamus, quo warranto, certiorari* and other original remedial writs.  Section 3 of the amendment of 1890, Missouri Constitution, expressly provides that each division of the Supreme Court shall have authority to issue the original writs and exercise the powers enumerated in section 3 of article 6.  This constitutional provision must have proceeded upon the theory that, in the absence of express authority in the Constitution itself, these writs could not be issued except by the court as a court, and it is an idle provision if one judge, out of term, is the Supreme Court within the meaning of section 3 of article 6.  The word court, as used in the Constitution, is used in its technical sense. It means a judicial assembly.  It does not mean one of the judges at chambers.  State ex rel. v. Woodson, 161

Mo. 453; Brumley v. State, 20 Ark. 77; In re Garvey, 7 Colo. 502. But it may be contended that the statute on prohibition confers this power on one of the judges. To this it may be answered: (a) That the provision of section 4449 providing as to the "judges thereof to the extent hereinafter provided in this article" only applies to the judges of the other courts; that section 4451, which provides the "extent," has been distinctly held applicable only to the regulation of the statutory writ of prohibition in circuit courts and other inferior courts.· State ex rel. v. Eby, 170 Mo. 527; State ex inf. v. Beechner, 160 Mo. 86. (b) This statute is not intended to confer any such power on the judges of the Supreme Court acting singly; and the Legislature, in the absence of constitutional authority, could not confer such power, the jurisdiction of the Supreme Court being "appellate only," except·as to the original remedial writs. The judicial power of the Supreme Court is derived from the Constitution. The Legislature can neither enlarge nor abridge the power conferred by the Constitution. Ex parte Vallandingham, 1 Wall. 243; Ex parte Yerger, 8 Wall. 85; State ex rel. v. Eby, 170 Mo. 527; State ex inf. v. Beechner, 160 Mo. 86. (2) Under the reasoning of the construction adopted by the Supreme Court of the United States of its own appellate powers and power to issue original remedial writs, the power of this court to issue the writ in cases similar to the one at bar may well be doubted—the exercise of the writ in this case being an interference with the " *exclusive* original jurisdiction in civil cases" conferred by the Constitution on the circuit courts, and is not the proper exercise of appellate jurisdiction. Marburg v. Madison, 1 Cranch 137; Whipple v. Stevenson, 25 Colo. 447; Britton v. Steber, 62 Mo. 374. And emphatically because the writ of prohibition may and does interfere with the "exclusive original jurisdiction in civil cases." "The writ of prohibition goes only to restrain the assumed exercise of jurisdiction, and

not to its erroneous or irregular exercise.   It can not issue where other remedies exist nor be made to perform or usurp the functions of an appeal.''   State ex rel. v. Withrow, 108 Mo. 1; State v. Klein, 116 Mo. 268; State v. Nathan, 4 Rich. Law (S. C.) 516; 3 Bl. Com., 112; Wilson v. Berkstresser, 45 Mo. 285; State ex rel. v. Burckhartt, 87 Mo. 533; State ex rel. v. St. Louis Court of Appeals, 99 Mo. 224; Britton v. Steber, 62 Mo. 374; Maynard v. Railey, 2 Nev. 313; State v. Scarritt, 128 Mo. 339; State ex rel. v. Wood, 155 Mo. 485 (dissenting opinion of Judge BURGESS).   (3)   However jealously this court may guard its power, it will not grant prohibition where the lower court had the power to hear and determine, even though the court below determined wrongfully.   State ex rel. v. Withrow, 108 Mo. 108; Wilson v. Berkstresser, 45 Mo. 285; State ex rel. v. Burckhartt, 87 Mo. 533; State ex rel. v. Davidson, 99 Mo. 216.   It will not grant prohibition if there is a remedy by appeal (except in cases involving public rights, where the interest of the whole State is involved).   State v. Nathan, 4 Rich. Law (S. C.) 516; Wheeler v. Northern Col. I. Co., 9 Col. 248; State ex rel. v. Klein, 116 Mo. 259; Martin v. Sloan, 98 Mo. 252.   The judge had the power to appoint a receiver without notice.   Greeley v. Bank, 103 Mo. 222; Thompson v. Greeley, 107 Mo. 586.   Filing of *lis pendens* no bar to appointment of receiver.   Because *lis pendens* would prevent none of the acts complained of in the petition except the transfer of the real estate in Washington county.   *Lis pendens* did not protect the plaintiff against waste by Robinson of the moneys on hand, of the rents and profits of the lands; it did not protect against the threatened removal of the books, nor against the continuance of the alleged frauds by Robinson under his control of the American Lead & Baryta Company.   Filing of *lis pendens* is certainly no bar in partnership proceedings to appointment of receiver. *Lis pendens* is never adequate protection against dis-

persal or disposal of personal property.   Carr v. Lewis Coal Co., 96 Mo. 156; McLaurine v. Monroe, 30 Mo. 469.

MARSHALL, J.—This is an original proceeding in prohibition to prohibit the defendant judge from further enforcing or carrying into effect an order appointing the defendant Donnell as receiver for the relator company, the American Lead & Baryta Company, made in a suit heretofore instituted and now pending in the circuit court of Washington county, wherein the defendant William J. Elledge is the plaintiff and the American Lead & Baryta Company and others are the defendants.

A preliminary rule in prohibition was heretofore issued in this case.   The defendant Elledge filed a motion to quash the writ.   The defendant Donnell filed a return showing compliance with the commands of the preliminary rule, and submitting himself to the further order of this court.   Before the return day of the preliminary rule the defendant Dearing, Judge, died, and his successor has been appointed and qualified, and he now adopts a return which had been prepared by his predecessor, and which had been filed by defendant Elledge as a part of his motion to quash.   The matter has been fully argued by learned counsel and submitted for decision.

The pleadings and exhibits filed in this case are quite too voluminous to be reproduced or even fully abstracted in an opinion.   For the purposes of this case it is only necessary to state the ultimate facts shown, and they will be stated in substantially the chronological order of their occurrence.

Some time prior to November 22, 1900, the defendant Elledge and one William Long had secured options to buy some twenty-six thousand acres of land in Washington county, which were believed to contain rich ores, and especially baryta and other basic elements of paints.   O. E. Robinson lived in Baltimore, Maryland,

and was engaged in the business of manufacturing paints in that city. He was the president of the National Mining and Milling Company, which was located in Baltimore, and he or the company owned certain patents or processes and machinery for the manufacture of paints.

About the twenty-second of November, 1900, Elledge, Long, Robinson, G. H. TenBroek, John Morton and Moses Greenwood, Jr., agreed to form and did form a corporation, to be known as the American Lead & Baryta Company, with a capital stock of ten million dollars and a bond issue of one million two hundred and fifty thousand dollars. Robinson was to put into the company the patents, processes, machinery, etc., of the National Milling Company, and to take therefor two million dollars of the capital stock and one hundred thousand dollars of said bonds. Elledge and Long were to turn over to the company the options they held on the twenty-six thousand acres of land aforesaid, which it is alleged were worth one million dollars.

Accordingly, the American Lead & Baryta Company was organized under the laws of Delaware, and obtained a license to do business in this State, and opened an office in the Wainwright building in St. Louis. Robinson was made president of the company. It was the original intention to sell enough stock and bonds to pay for the lands on which options were held as aforesaid, and to pay Robinson or the National Mining and Milling Company for the patents, machinery, etc., aforesaid, in stocks and bonds as aforesaid, and the profits of the venture, according to Elledge, to be divided one-fifth each to Greenwood, TenBroek, Morton and Robinson and one-tenth each to Elledge and Long. It being the original intention that the stock should be sold so as to pay for the options aforesaid, and to secure working capital for the company, all of the stock except enough shares to make up a board of directors, was issued in the name of the president, Robinson. It

was agreed that Elledge, Greenwood, TenBroek and Long should make diligent efforts to sell the stock and bonds aforesaid.

The value of the patents, machinery, etc., that Robinson or the National Mining and Milling Company were to put into the new company is nowhere stated, but the petition in the original case alleges that Robinson represented them to be of great value and that the business of said National Company was being conducted at a profit of sixty thousand dollars a year, but that such patents, machinery, etc., were not turned over to the new company. On the contrary it is charged that money borrowed by the new company was being diverted by Robinson to pay the debts of the National Company and were applied to his own use.

The attempt to sell the stock and bonds of the new company and thereby to raise money to pay for the lands in Washington county proved futile; the options were about to expire, and therefore an arrangement was made in 1901 with the Missouri Trust Company to advance the new company the sum of five hundred thousand dollars, with which to pay for the lands, and as security therefor the title to the land was to be conveyed direct to the Trust Company, to be held by it until the stock and bonds could be issued, when the Trust Company was to take one million two hundred and fifty thousand dollars of bonds and the same amount of stock of the company. The Trust Company also required O. E. Robinson to execute to it his two notes, one for four hundred thousand dollars, indorsed by his brothers J. K. Robinson and A. H. Robinson, and one for one hundred thousand dollars indorsed by said Morton and Jacob Stocke.

Accordingly the Trust Company advanced the five hundred thousand dollars, and Elledge and Long transferred to it the options on the land held by them, out of which the Trust Company paid for the land and took the legal title in its own name, and Robinson ex-

ecuted the two notes aforesaid. The new company then began business by establishing four stores, buying some horses and mules and proceeded with its mining and business operations. Elledge became general or district manager of the company, and continued to act as such until he instituted the original suit, and as such manager was paid something over five thousand dollars. for his services.

The business of the company was thus carried on for about two years, and the plaintiff and Greenwood and TenBroek and Long were all the while unsuccessfully engaged in trying to negotiate the bonds and sell the stock. In the early part of the present year the Trust Company, never having received the stock and the bonds aforesaid, threatened to sell the land. In the meantime there had been suits going on about the title to certain of the lands. The Baryta Company had had to borrow about thirty thousand dollars and Robinson had indorsed the notes and pledged certain of the stock to secure the notes. Robinson had also advanced considerable money for the company, said by relator to have amounted to thirty-five thousand dollars, and incurred about eight thousand dollars liability for the company, and had never received a cent of the twenty-five thousand dollars a year that he was to receive as president of the company.

In this plight the Baryta Company, through Robinson and Morton, made an arrangement with the Trust Company, whereby that company advanced about one hundred and thirty-five thousand dollars more, to clear up the title to the land, and it was agreed that time, until June 1, 1904, should be given the Baryta Company to pay up what it owed the Trust Company, and that in the meantime Morton should devise some method of reorganizing and refinancing the Baryta Company.

Morton devised a scheme whereby the old ten-million-dollar stock issue and the old million and a quarter

bond issue were to be cancelled; he, Morton, was to turn over to the Baryta Company certain mining securities, stated to be worth four hundred thousand dollars, upon which and upon all other property of the company, the Trust Company was to have a first mortgage of six hundred thousand dollars, and a second mortgage for not exceeding three hundred thousand dollars was to be put upon the same with which to pay the other indebtedness of the company, aggregating one hundred and thirty-five thousand dollars, and also to pay Robinson what the company owed him for advances and salary, and sixty thousand dollars of the second mortgage bonds were to be turned over to Elledge, Greenwood, TenBroek and Morton in equal parts, Elledge, however, to share his part equally with Long and one McGregor.

The matter was in this shape on May 30, 1904, when Elledge filed a suit in the circuit court of Washington county, against O. E. Robinson, John Morton, G. H. TenBroek, Moses Greenwood, Jr., William Long, Missouri Trust Company, The American Lead & Baryta Company, J. K. Robinson and R. S. Culbreth, in which most of the facts herein stated are set out, certain charges of mismanagement of the affairs of the company by Robinson are pleaded; the charge of excluding Elledge from participation in the affairs of the company and concealing from him the papers and books of the company is made, a general charge is made that Robinson lives in Maryland and is represented in Missouri by his attorney, the defendant, Culbreth, and that there is danger that said attorney will remove the books and papers of the company from the State. The petition alleges that the business of the company has been conducted at a profit, but not as large as it should have been, and states the value of the lands to be over one million dollars. There is no allegation that the company is insolvent. It is alleged that Elledge was to share in the profits of the venture and that Robinson

has not turned over any of the stock to him, but there is no allegation that he was to have any stock issued to him, nor that any demand had ever been made upon Robinson to do so, and no averment that any profits have ever been made that could be divided.

The prayer of the petition is that a receiver be appointed to take charge of all the property of the company; that Culbreth be "mandamused" to deliver to the receiver all the books and papers of the company, and that the officers of the company be likewise commanded; that an accounting be had; that all agreements of the company not in accordance with the original agreement of the incorporators be annulled; that all stock and bonds originally authorized to be issued, be transferred to the plaintiff and his associates; that the Trust Company be compelled to accept the stock and bonds originally agreed to be turned over to it in payment for the money advanced to buy the land; that a decree be entered declaring that the Baryta Company has failed to carry out the objects of its incorporation and that the corporation be dissolved; that the rights of the parties be ascertained and decreed accordingly; that the title of the Trust Company be decreed to be a mortgage, and that the title to the land be vested in the plaintiff, Elledge, and his associates, subject to the lien of the Trust Company.

On the same day that said suit was filed, the plaintiff therein filed a *lis pendens* in Washington county, affecting all of the land so held by the Trust Company.

At the time the suit was filed the company had its office in the Wainwright building in St. Louis, and all of its books and papers were there, except some papers necessary to be used in a suit that was pending in Baltimore, which the defendant, Culbreth, as attorney for the company, had in his office in Baltimore, and he was, and for several months had been, in the company's office in St. Louis, working upon the reorganization of the company.

At the time the suit was begun the land and the stores and the animals belonging to the company, were in Washington county, and the company had about two thousand dollars on deposit in the Missouri Trust Company in St. Louis.

On the first of June, the defendant, the Baryta Company, learned that suit had been begun, and it instructed its local attorney in Washington county to go to the county-seat and look after it. He went there and met the plaintiff's attorneys and asked them if they intended to apply for the appointment of a receiver. They replied that the judge was too sick to attend to business, and that they would not apply for a receiver. The attorneys then left the county-seat and went home. The local attorney of the Baryta Company then wrote to the judge asking that he be heard before any action was taken looking towards the appointment of a receiver.

Afterwards at some time between the first and the fourth of June, 1904, the plaintiff's attorneys, without any notice to the defendants, applied to the judge, who was then sick in bed, for the appointment of a receiver, and on June 4th, the judge, in vacation of court, at chambers (to-wit, his sick room), without notice to the defendants, appointed the defendant Donnell receiver, and commanded the officers of the Baryta Company to turn over to him all of the property, books and papers of the company, and directed the receiver to take possession thereof, which was all done. The plaintiffs were not required to give bond in the case, and the receiver gave bond in the sum of twenty-five thousand dollars for the faithful discharge of his duties as receiver. The court further ordered defendants to show cause, in vacation, at chambers, on June 20th, why the order appointing the receiver should not be made permanent.

Thereupon, the Baryta Company and the Trust

Company applied to a judge of this court, in vacation, at chambers, for a preliminary rule in prohibition, prohibiting the circuit judge, the receiver and the plaintiff in the case, from enforcing the order appointing the receiver until the further order of this court and directing the receiver, in the meantime, to restore the property to the Baryta Company. A rule was accordingly ordered and made returnable before this Court in Banc, on the twenty-second of June, 1904. Before the return day the defendant judge died, his successor was appointed and entered his appearance and adopted the return which had been prepared by the defendant judge. The defendant Elledge filed a motion to quash the return upon the grounds to be hereafter stated in the course of the opinion. The receiver filed a return showing compliance with the parliamentary rule and submitting himself to the further order of this court. The relators filed a motion to strike out the motion to quash the rule. The case was then fully heard by this court on the first day of July, 1904.

## I.

The first contention of the defendants is, that a judge of this court, in vacation, has no power to issue a preliminary rule in prohibition, but that the power to issue writs of prohibition is vested in the Court in Banc or in any one of the divisions of the court acting in term time.

This is no longer an open question in this State. The contention was first made, met and disposed of by this Court in Banc in State ex rel. Macklin v. Rombauer, 104 Mo. 619.

That case was cited and followed and the point treated as settled in State ex rel. Rogers v. Rombauer, 105 Mo. 103. It was also cited approvingly in Brewing Company v. Talbot, 135 Mo. l. c. 172. Since that time such preliminary rules in prohibition have been issued, in vacation, many times by individual judges of this

court, returnable to court in term time and the court has heard and determined the cases. [State ex rel. v. Ross, 122 Mo. l. c. 454; State ex rel. v. Aloe, 152 Mo. l. c. 475; Arnold v. Henry, 155 Mo. l. c. 51; State ex rel. v. Oliver, 163 Mo. l. c. 680; Davison v. Hough, 165 Mo. 561; State ex rel. v. Spencer, 166 Mo. l. c. 273; State ex rel. v. Eby, 170 Mo. 497; Schubach v. McDonald, 179 Mo. l. c. 175; State ex rel. So. Mo. Pine Lumber Co. v. Dearing, 180 Mo. l. c. 61.]

After the decision in State ex rel. Macklin v. Rombauer, supra, the General Assembly of this State passed an act relating to prohibition, by the terms of which a judge of this court, in vacation, was expressly given power to issue a preliminary rule in prohibition returnable to and triable by the court in term time. [Laws 1895, p. 95; R. S. 1899, ch. 55.]

It is said, however, that the original jurisdiction of this court conferred by section 3 of article 6 of the Constitution relates only to the original writs therein specified as they were known to the common law. The contrary has been held, by the Court in Banc, to be the law. [State ex inf. v. Towns, 153 Mo. l. c. 106.]

So that considered either upon the inherent power of this court, the power conferred by the Constitution or the powers conferred by statute, it is now the settled law in this State that a judge of this court has power during the vacation of the court to issue a preliminary rule in prohibition returnable to and triable by the court in term time.

## II.

It is next contended that under the facts disclosed by the record in this case the circuit judge in vacation did not exceed his power in appointing a receiver without notice to the defendants and in issuing a rule returnable before him in vacation to show cause why the appointment should not be made permanent.

There can be no question that the order to show

cause, in vacation, why the appointment of the receiver should not be made permanent was in excess of the jurisdiction of the judge. [State ex rel. v. Woodson, 161 Mo. 444.]

The reason of the rule is that a judge in vacation has a right to preserve the *status quo* until the court can act but he has no power to enter a judgment in the cause—that power is vested in the court to be exercised in term time. Therefore so much of the order as required the defendants to show cause in vacation why the appointment of the receiver should not be made permanent was clearly in excess of the power of the judge to make.

It is seriously contended, however, that under the facts in judgment here, the judge had power, and it was proper for him, to appoint a receiver for the Baryta Company, in vacation, and without notice to the defendants.

In speaking to this question this court in Rees v. Andrews, 169 Mo. l. c. 189, said: "It would not be profitable, and it is not necessary at this time, to enter upon an extended or exhaustive discussion of the power of courts of equity, in proper cases, to take the property in controversy out of the possession of one of the parties litigant and place it in the possession of a receiver. Some of the cases treat such a proceeding as analogous to an attachment in an action at law, and some hold that it partakes somewhat of the nature of a writ of injunction. [17 Enc. Pl. and Pr., p. 683, and cases cited in notes.] But all the cases concur in holding that before such an order is made the persons to be affected must have notice and an opportunity to be heard, and the only exceptions to this rule are, first, where defendants are non-residents or conceal themselves to prevent service of notice, and, second, where irreparable injury will probably ensue if the property is not brought into court at once and before notice can be served. [17 Enc. Pl. and Pr., p. 719, and cases;

Smith on Receiverships, p. 14; Beach on Receivers, p. 153, sec. 148; consult Railroad v. Wear, 135 Mo. l. c. 262, 263 and 253.]''

It was further said in that case: ''The petition does not charge that Butler is insolvent, nor that irreparable injury would probably ensue if the property is not brought into court at once and before notice could be served, nor yet, that there is imminent danger of loss, or great damage, or that it is a case of gravest emergency. [Smith on Receiverships, p. 17, and cases in notes.]''

That case was in many respects like the case at bar. There, as here, the plaintiff was seeking to have the property of one against whom the plaintiff had no claim, placed in the hands of a receiver pending an action to settle the differences between the plaintiff and a third person. It was held in that case that the court had no power to appoint a receiver.

Pullis v. Pullis, 157 Mo. 565, was an appeal from a refusal of the circuit court to vacate an order appointing a receiver to take charge of property that had been sold by a company, pending a suit between the stockholders of the company regarding the validity of the deed of trust under which the property had been sold, and respecting the legality of the said sale, and the adjustment of certain priorities of liens.

It was said in that case: ''The petition does not charge, and the evidence does not even tend to prove, that the defendants in possession are insolvent, or that the preferred debts are not honest, or that the deed of trust is fraudulent, or made for any other purpose than to prefer the creditors therein named, or that there is any waste contemplated or permitted which will injuriously affect the parties, or that the property is perishable, and therefore the usual grounds for the appointment of a receiver are totally lacking in this case. [Merriam v. Railroad, 136 Mo. 145; Smith on Receiverships, sec. 15, p. 38, et seq.; Beach on Receiverships

(Alderson's Ed.), p. 112 et seq.] The plaintiff filed a *lis pendens* so that the defendant in possession could not convey the property to an innocent purchaser for value and without notice, and therefore for this reason the plaintiff showed no right to a receiver in this case [Ibid.]."

It will be noted that in the Pullis case there was a notice and hearing before the receiver was appointed, while in the Rees case, as in this case, there was no such notice or hearing.

In this case the title to the land is in the Missouri Trust Company. Neither the plaintiff nor the Baryta Company nor any of the defendants have paid a cent for the land, but the Missouri Trust Company paid the five hundred thousand dollars for the land originally, and has since paid over one hundred thousand dollars to clear up the title thereto. If, therefore, the deeds to the Trust Company be treated as mortgages, the Trust Company has done nothing to authorize or justify the land being placed in the hands of a receiver and the collection of its debt thereby delayed. The balance of the property is in the hands of its legal owners, the Baryta Company, and it is not pretended that that company is insolvent, nor that it is wasting the property, nor that it has done anything to justify its property being placed in hands of a receiver. It is admitted that it is a going concern, and has conducted its business at a profit. The plaintiff is its general or district manager. He is not a stockholder or a creditor of the company so far as his petition shows. He does not allege that he is entitled to any of the stock of the company, but only that he is entitled to a one-tenth share of the profits. He knew that the scheme was to sell the stock and bonds of the company to raise money enough to pay for the land, and to pay the National Mining and Milling Company for its patents, machinery, etc., and to provide a working capital for the Baryta Company, and he knew that the stock was is-

sued in the name of the president of the company so that it could be so sold. He also knew that for over two years he had been trying with his "associates" to sell the stock and bonds and had been unable to do so, for the manifest reason that the ten million dollars stock and the million and a quarter of bonds had no financial basis to rest upon except the land which had originally cost five hundred thousand dollars, and which it had subsequently cost over one hundred thousand dollars to perfect the title of, together with the patents, machinery, etc., that were, or were to be, put into the company by the National Mining and Milling Company or by Robinson. He also knew that there had been no profits that could be divided. He also knew that he had never subscribed or paid for a single share of the Bartya Company, and had never put a cent into that company. The only thing he had done was to turn over the options he and Long held to buy the lands, which were about to expire and which he was wholly unable to avail himself of because he did not have five hundred thousand dollars with which to pay for the land.

In short the plaintiff in this case was a mere paper promoter of the scheme, was not and had no right to be a stockholder in the company, and is not a creditor of the company, and yet he asks judgment in his own favor that the title to the lands be vested in him, subject to a lien in favor of the Trust Company, and that the company be dissolved, and, *mirabile dictu,* asks that the Trust Company be compelled to accept a million and a quarter of the bonds and a like amount of the stock of the Baryta Company, in satisfaction of its lien —to take the stock and bonds of a dissolved corporation in payment of its debt secured by deeds to the land.

If it be true that Robinson, the president of the Baryta Company, and the other directors of the company are mismanaging the affairs of the company, the law affords a remedy by removing them, but as long as

a corporation is solvent and a going concern, no court has the right to place it in the hands of a receiver—especially when the person making the application is neither a creditor nor a stockholder of the corporation, and has never put a dime into it.

If any of the officers of the company are about to unlawfully remove the books of the company from the State, an injunction will lie to prevent their doing so, if the person bringing the suit has any legal connection with the company such as would authorize him to ask the aid of a court of equity.

But in this case the office of the company is in St. Louis, where it has officers who could be served with process to bring them into court. The real estate is in Missouri, and can not be disposed of because the plaintiff has filed a *lis pendens.* The personal property is principally in Washington county, and there is no allegation that it is being wasted or about to be removed from the State. There is no emergency or exigency whatever which authorizes the appointment of a receiver. The original scheme of floating ten million dollars stock and a million dollars of bonds upon a basis of about a million dollars property, has failed, as the parties should have known that it would. The company is trying to place itself upon a solid financial basis by cancelling all the old stock and bonds, and executing two mortgages on the property it has, which the plaintiff says is worth a million dollars, and upon other securities to be turned over to the company by Morton, worth, it is alleged, four hundred thousand dollars, the first of which mortgages is to be to the Trust Company for six hundred thousand dollars to reimburse it for what it advanced, and the second of which mortgages is to be for not to exceed three hundred thousand dollars, to be used to pay the floating and otherwise secured debts of the company, to afford it a working capital, and to give the plaintiff and his associates sixty thousand dollars as their profits in the venture. The

effort to thus put itself upon a sound financial basis is the extent of the company's offending. Instead of defeating such a laudable purpose by placing the company in the hands of a receiver, the courts should encourage such manifest honesty of purpose and display, even at the eleventh hour, of good business sense.

The trial court clearly exceeded its jurisdiction in appointing a receiver.

### III.

But it is said that no application was made to the judge to vacate the order appointing the receiver, and therefore the preliminary rule in this case should be discharged.

The excess of jurisdiction clearly appears upon the face of the record and there was no necessity, therefore, to suggest that fact to the trial court before applying for a prohibition from this court. [State ex rel. v. Oliver, 163 Mo. 1. c. 696; State ex rel. v. Hirzel, 137 Mo. 435; State ex rel. v. Eby, 170 Mo. 497.]

For these reasons the preliminary rule in prohibition heretofore issued is made absolute. *Robinson, C. J., Brace, Gantt* and *Valliant, JJ.,* concur; *Fox, J.,* concurs in result; *Burgess, J.,* absent.